**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ITSERVE ALLIANCE, INC.,

           Plaintiff,

           v.

DEPARTMENT OF HOMELAND
SECURITY,

           Defendant.

---

Case No. 1:20-cv-03855 (TNM)

## <u>MEMORANDUM OPINION</u>

Under federal law, an employer must file a new or amended H-1B visa petition on behalf of a U.S.-based foreign national employee whenever that employee experiences a "material change" in employment. In *Simeio Solutions, LLC*, 26 I&N Dec. 542 (AAO 2015), the Administrative Appeals Office (AAO) of the U.S. Citizenship and Immigration Services (USCIS) altered USCIS's interpretation of the phrase "material change." Before *Simeio*, a change of location within the United States was not material. So an employer did not have to file an amended H-1B visa petition when it moved a foreign employee from one domestic location to another. That changed after *Simeio*, which defined a "material change" to include changes in work location.

Plaintiff ITServe Alliance, Inc. challenges *Simeio* on summary judgment. ITServe is a trade association that represents information technology companies whose employees provide services at client sites. Employees of ITServe's members often change location. *Simeio* requires those members to file amended H-1B petitions—and pay filing fees—each time a foreign employee moves to a new geographic area.

ITServe argues (1) that USCIS lacks the authority to regulate the employment conditions of H-1B workers; (2) that the Secretary of the Department of Homeland Security (DHS) never designated *Simeio* as a precedential decision; (3) that *Simeio* is a procedurally defective legislative rule; and (4) that USCIS cannot issue binding interpretive rules.  In a cross-motion for summary judgment, DHS—USCIS's parent agency—contests each of these arguments and contends ITServe lacks standing.

The Court finds ITServe has standing because *Simeio*'s ruling harms its members.  The Court rejects ITServe's first argument because USCIS is not regulating workers' employment conditions.  ITServe's second argument is unpersuasive because the Secretary's delegate designated *Simeio* as precedential.  *Simeio* was an adjudication, not a legislative rule, so ITServe's third argument fails.  And ITServe's fourth argument is unconvincing because USCIS can issue binding interpretive rules.  For these reasons, the Court will deny ITServe's motion for summary judgment and will largely grant DHS's cross-motion.

## I.

Some background on the H-1B visa petition process illuminates the parties' arguments.  Obtaining one of these visas is a two-step procedure.  First, an employer, or "petitioner," must obtain a Labor Condition Application (LCA) from the U.S. Department of Labor (Labor).  *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n)(1); 8 C.F.R. § 214.2(h)(4)(i)(B)(1).  The LCA must show the employee's occupational classification, the wage the employee will receive, and the place the employee will work.  *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.731(c)(4).  The LCA also must show that the petitioner will pay the employee the higher of the actual or prevailing wage level for similarly situated employees in that location.  *See* 8 U.S.C. § 1182(n)(1)(A); 20 C.F.R. § 655.731(a).  Labor reviews LCAs only for completeness and accuracy.  *See* 8 U.S.C.

§ 1182(n)(1)(G).  But Labor may investigate an H-1B petitioner if it receives a complaint or believes the petitioner is not complying with the statements it made in the LCA.  *See* 8 U.S.C. § 1182(n)(2)(A); 20 C.F.R. §§ 655.805–807.

Once the petitioner has an LCA, it can file an H-1B petition with USCIS.  *See* 8 U.S.C. § 1184(c)(1); 8 C.F.R. § 214.2(h)(4)(i)(B)(1).  The petitioner must certify that it will comply with the terms of the LCA.  *See* 8 C.F.R. § 214.2(h)(4)(iii)(B).  USCIS considers applications case-by-case.  *See id.* § 214.2(h)(9)(i).  If USCIS approves the petition, the employee may reside in the United States and work for the petitioner for three years.  *See id.* § 214.2(h)(15).  An employee may receive a single, three-year extension.  *See id.*

If the conditions of employment change during this time, the petitioner must notify USCIS.  *See id.* § 214.2(h)(11)(i)(A).  And if there is a "material change" in the employee's terms or conditions of employment, the petitioner must file an amended or new petition with USCIS.  *See id.* § 214.2(h)(2)(i)(E).  USCIS can revoke the petition if the petitioner no longer employs the employee in the same job as originally specified in the petition or if USCIS discovers inaccuracies in the petition.  *See id.* § 214.2(h)(11)(iii).

Appeals of decisions on H-1B petitions go to the AAO.  *See* 8 C.F.R. § 103.4(a).  "The AAO 'exercises *de novo* review of all issues of fact, law, policy, and discretion.'  This standard of review 'means that, on appeal, the AAO looks at the record anew and its decision may address new issues that were not raised or resolved in the prior decision.'"  *Sadeghzadeh v. USCIS*, 322 F. Supp. 3d 12, 19 (D.D.C. 2018) (quoting AAO Practice Manual §§ 3.4–3.5[1]).  The AAO's decisions are usually "non-precedent decisions that apply existing law and policy to the facts of

---

[1] *Available at* https://www.uscis.gov/about-us/directorates-and-program-offices/administrative-appeals-office-aao/practice-manual/chapter-3-appeals (last updated Aug. 27, 2021).

an individual case." AAO Practice Manual § 1.5.[2]  Non-precedent decisions bind the parties in

the case, "but do not create or modify USCIS policy or practice" and thus "do not provide a basis

for applying new or alternative interpretations of law or policy." *Id.*  But "[o]n occasion, the

Secretary . . . may, with the Attorney General's approval, designate AAO decisions" as

precedential "in all future proceedings involving the same issue(s)." *Id.*; *see also* 8 C.F.R.

§ 103.3(c).

AAO decisions—including those the DHS Secretary designates as precedential—are

"informal adjudications" under the Administrative Procedure Act (APA).  *Fogo De Chao, Inc. v.*

*DHS*, 769 F.3d 1127, 1136 (D.C. Cir. 2014).  "[A]gencies may use informal adjudications when

they are not statutorily required to engage in the notice and comment process or to hold

proceedings on the record."  *Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 893 (D.C.

Cir. 2017) (cleaned up).  Often used in "highly fact-specific contexts," informal adjudications

lack "the hallmarks of legislative rulemaking" but "still must comply with the familiar APA

standard banning arbitrary and capricious actions."  *Id.* (cleaned up).

## II.

*Simeio* involved a petitioner, Simeio Solutions, LLC, that sought an H-1B visa for one of

its employees.  *Simeio*, 26 I&N Dec. at 542.  The employee was working on an F-1 student visa.

*Id.* at 542–43.  Simeio submitted a Form I-129 with an LCA to USCIS's California Service

Center Director (Director) seeking to re-classify the employee into H-1B status.  *Id.*  The LCA

stated that the employee would work in Long Beach, California.  *Id.* at 543.  The petitioner

requested no other worksites for the employee.  *Id.*  The Director approved the petition.  *Id.*

---

[2]  *Available at* https://www.uscis.gov/administrative-appeals/aao-practice-manual/chapter-1-the-administrative-appeals-office (last updated July 11, 2018).

The employee then returned home to India to apply for an H-1B visa at the U.S. Embassy in New Delhi. *Id.* A consular official asked for documents supporting the employee's work back in the United States. *Id.* Rather than submitting the requested documents, the employee submitted other documents showing that he intended to provide services to clients not previously identified in his petition. *Id.* The consular official returned the petition to the Director for review. *Id.* After an investigation, the Director issued a notice of intent to revoke the petition. *Id.* at 543–44.

Simeio responded and confirmed that the employee no longer worked on the project or at the location specified in the original petition. *Id.* at 544. Simeio then submitted an LCA that provided two new worksites:  Camarillo, California, and Hoboken, New Jersey. *Id.* The Director concluded that employing the employee at these new worksites constituted a "material change to the terms and conditions of employment" specified in the original petition. *Id.* Citing 8 C.F.R. § 214.2(h)(2)(i)(E), USCIS stated that the employer should have filed an amended petition corresponding to the new LCA when the employee switched locations. *Id.* Because the petitioner had not done so, the Director revoked the visa petition and certified the decision to the AAO. *Id.*

The AAO affirmed the Director's decision. *Id.* at 549. It began by citing 8 C.F.R. § 214.2(h)(2)(i)(E), which specifies when a new or amended petition must be filed:

> The petitioner shall file an amended or new petition, with fee, with the Service Center where the original petition was filed to reflect any material changes in the terms and conditions of employment or training or the alien's eligibility as specified in the original approved petition.  An amended or new H-1C, H-1B, H-2A, or H-2B petition must be accompanied by a current or new Department of Labor determination.  In the case of an H-1B petition, this requirement includes a new labor condition application.

5

The AAO then noted that under 8 U.S.C. § 1182(n), an alien may not be admitted in H-1B status unless the petitioner has obtained an LCA attesting that the petitioner will pay the employee the actual wage it pays to all similarly situated individuals *or* "the prevailing wage level for the occupational classification in the area of employment." *Simeio*, 26 I&N Dec. at 545 (cleaned up). Because the statute ties both an LCA and an H-1B petition to the "area of employment," the AAO reasoned that a change in location would be a material change. *Id.* at 548. If a petitioner transfers an employee to a new location, to satisfy § 1182(n) the petitioner might need to pay the employee more. *Id.* A new wage level would require a new LCA certifying that the petitioner was paying the employee the actual or prevailing wage at the new location. *Id.* And unless a new H-1B petition was also filed, there would be a mismatch between the LCA and the original H-1B petition. *Id.* The AAO concluded that "[f]undamentally, for an LCA to be effective and correspond to an H-1B petition, it must specify the beneficiary's place(s) of employment." *Id.*

Applying this conclusion to Simeio's situation, the AAO noted that the Long Beach address in the original LCA was different from the Camarillo and Hoboken addresses. *Id.* More, the salary listed on the H-1B petition was $9,000 less than would be required in either Camarillo or Hoboken. *Id.* "Such changes in the terms and conditions of the beneficiary's employment may, and in this case did, affect eligibility under [8 U.S.C. § 1101](a)(15)(H)" (the statute defining what it means to be an H-1B nonimmigrant). *Id.* The petitioner was therefore required to "immediately notify USCIS and file an amended or new petition, along with a corresponding LCA certified by [Labor], with both documents indicating the relevant change." *Id.* at 549 (citing 8 C.F.R. §§ 214.2(h)(i)(E), (h)(11)(i)(A)). Because Simeio did not file a new or amended H-1B petition, the AAO affirmed the Director's revocation. *See id.*

6

USCIS then issued guidance explaining what *Simeio* meant for H-1B petitioners.  *See* Joint App. (JA) at 64–70, ECF No. 28.[3]  The guidance states that, except for a few specifically listed exceptions, "a petitioner must file an amended or new H-1B petition if the H-1B employee is changing his or her place of employment to a geographical area requiring a corresponding LCA to be certified to USCIS."  JA at 65.

After ITServe sued to overturn the *Simeio* decision and USCIS's guidance, both parties sought summary judgment.  *See* Joint Status Report at 1, ECF No. 11.  At the completion of summary judgment briefing, the Court ordered supplemental briefing on certain issues related to ITServe's Article III standing.  *See* Order, ECF No. 29.  The parties have now submitted the supplemental briefing.  The Court begins there and, finding that ITServe has standing, then considers the merits arguments raised in the summary judgment briefing.

### III.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  This means that "[t]he entire case on review is a question of law."  *Id.* (cleaned up).

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "[D]istrict courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but instead operate as appellate courts resolving

---

[3]  All page numbers refer to the pagination generated by the Court's CM/ECF filing system.

legal questions." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  The

APA also provides that a reviewing court must set aside agency action if the agency has acted

"without observance of procedure required by law" or "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(D), (C).

## IV.

To prove Article III standing, a litigant must suffer an actual or imminent injury that is

fairly traceable to the defendant's action and that a favorable ruling could redress.  *See Monsanto*

*Co. v. Geertson Seed Farms*, 561 U.S. 139, 149–150 (2010).  An association must meet

additional requirements.  To show associational standing, ITServe must establish that "(a) its

members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit."  *Nat'l Ass'n of*

*Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (cleaned up).

There are two categories of standing arguments before the Court.  First, DHS argues that

ITServe failed to allege that any of its members faces an imminent risk of harm.  Second, the

Court asked for supplemental briefing about whether a non-party has standing to challenge an

agency adjudication.  The Court considers each set of arguments in turn.

## A.

DHS focuses on the first element of associational standing.  It claims that "ITServe has

not presented specific facts to show that its members are currently affected by the AAO's

decision in *Simeio*."  Def.'s Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J.

(Def.'s Mem.) at 34, ECF No. 22-1.  In other words, DHS claims that because ITServe's

members must have standing to sue in their own right, *see Nat'l Ass'n of Home Builders*, 667

F.3d at 12, and because no member company suing in its own right can show the required actual or imminent injury, *see Monsanto*, 561 U.S. at 149–50, ITServe lacks standing.

DHS acknowledges that ITServe submitted a declaration from its president testifying that its members have been—and will continue to be—affected by *Simeio*. Def.'s Mem. at 34; *see also* Decl. of Amareswararo Varada (Varada Decl.), ECF No. 1-1. But DHS claims this declaration lacks sufficient specificity. Def.'s Mem. at 34. It likens this case to *Humane Society v. Perdue*, 935 F.3d 598 (D.C. Cir. 2019). *Id*. at 35–36. There, the Circuit found the plaintiffs lacked standing because the declaration they submitted "nowhere assert[ed] a diminished return on investment, a reduced bottom line, or any similar economic injury." *Humane Society*, 935 F.3d at 602–03.

The Court disagrees with DHS's comparison. Start with the argument that this case is like *Humane Society*. At issue in that case was the Pork Promotion, Research, and Consumer Information Act, which required pork farmers to pay assessments to the National Pork Board (Board) for the promotion of the industry. *See id.* at 600. For a marketing campaign, the Board entered a 20-year contract for trademarks owned by the National Pork Producers Council (Council). *Id.* at 601. After a few years, the Board stopped using the trademarks but kept paying the Council. *Id.* A pork farmer, the Humane Society, and one associational plaintiff sued the U.S. Department of Agriculture, the Board's parent organization. *Id.* The farmer argued that the Board was misusing the assessments. *Id.* at 603. He claimed that this deprived him of "the direct economic benefit of the lawful and effective promotions to which he [was] entitled as a statutory beneficiary." *Id.* (cleaned up). The Circuit determined this was insufficient for standing because the farmer showed no "harm to his bottom line." *Id.* at 604.

Unlike that farmer, ITServe has alleged harm to its members' bottom lines. Varada says that ITServe's members place their employees at client sites on contracts lasting between six and twelve months. Varada Decl. ¶ 9. At the end of these contracts, the employees must often move to a new client location. *Id.* Before *Simeio*, moving an employee just required filing an updated LCA with Labor. After *Simeio*, ITServe's companies must file amended H-1B petitions, which involve a "significant expense and drain on resources." *Id.* ¶ 10. ITServe says these fees are currently $460 for filing and $1,440 for expedited decisions. Compl. ¶ 27. An amended petition seeking to extend an authorized stay comes with another $1,500 fee. *Id.* These costs, unlike the allegations in *Humane Society*, show a direct effect on ITServe members' finances.

To "resolve any possible doubt," ITServe submitted with its reply brief a declaration from the president of Saxon Global, Inc., an ITServe member company. Pl.'s Opp'n to Def.'s Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. (Pl.'s Reply) at 10, ECF No. 25; Decl. of Gopi Kandukuri (Kandukuri Decl.), ECF No. 25-1. Kandukuri says that Saxon Global "regularly employs foreign nationals in H-1B status in computer-related occupations to provide information technology services." Kandukuri Decl. ¶ 8. He adds that Saxon Global is "often required to move H-1B employees during the timeframe of their authorized employment to new customer locations in Metropolitan Statistical Areas not included in the initial Labor Condition Application filed in support of the company's approved H-1B petitions." *Id.* ¶ 9. Kandukuri gives a specific example of one employee's move that cost the company $460 in filing fees and $1,370 in attorney fees. *Id.* ¶ 15. He expects that Saxon Global will need to file 63 new or amended H-1B petitions in the next three years to accommodate employees switching client sites. *Id.* ¶ 16.

DHS replies that because ITServe submitted the Kandukuri Declaration with its reply—and not with the initial motion for summary judgment—the declaration is a "backdoor request for a do-over."  Def.'s Reply in Supp. of Mot. for Summ. J. (Def.'s Reply) at 11, ECF No. 27. DHS argues this "request for a do-over" conflicts with two cases:  *American Chemistry Council v. U.S. DOT*, 468 F.3d 810 (D.C. Cir. 2006), and *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002).  In *American Chemistry Council*, the Circuit said that "[i]t is not enough to show . . . that there is a substantial likelihood that at least one member may have suffered an injury-in-fact. Our standard has never been that it is *likely* that at least one member has standing.  At the very least, the identity of the party suffering an injury in fact must be firmly established."  *Am. Chem. Council*, 468 F.3d at 820.  And in *Sierra Club*, the Circuit held that a plaintiff is obligated to "establish its standing by the submission of arguments and any affidavits or other evidence . . . at the first appropriate point in the review proceeding."  *Sierra Club*, 292 F.3d at 900.  Thus, says DHS, ITServe lacks standing because it did not specifically identify an ITServe member in its opening brief.  *See* Def.'s Reply at 11.

But neither case suggests that a plaintiff that addresses standing in its first brief but fails to identify a specifically harmed member in that brief has failed to show standing—provided it later identifies a particular, harmed member.  More, both cases are distinguishable.  In *American Chemistry Council*, petitioners submitted no declarations or citations to the record—despite two opportunities—to establish standing.  *Am. Chem. Council*, 468 F.3d at 820.  That left the court with a host of unanswered questions about the link between the defendant's actions and the plaintiff's harm.  *See id*.  Not so here.

In *Sierra Club*, the D.C. Circuit reviewed a rulemaking on direct appeal.  *See Sierra Club*, 292 F.3d at 897.  Defendant EPA challenged standing in its brief, leading Sierra Club to

make arguments about standing, for the first time, in its reply brief. *Id.* at 898, 900. That did not allow for the "full development of the arguments for and against standing" through "the tried and true adversarial procedure." *Id.* at 900. In making its point, the Circuit quoted *Grant v. United States Air Force*, 197 F.3d 539, 543 n.6 (D.C. Cir. 1999), for the proposition that "an argument first made in the reply comes too late." *Id.*

But unlike *Sierra Club*, because DHS cross-moved for summary judgment, it got the last word and the opportunity to rebut the Kandukuri Declaration. The Court thus has the benefit of the "adversarial procedure." *Id.* And unlike *Grant*—where the plaintiff challenged an *argument* for the first time in her reply brief—Kandukuri's declaration was not a new argument. *See Grant*, 197 F.3d at 543 n.6. It was more evidence for standing, which ITServe first addressed in its Complaint with the Varada declaration.

DHS tries one last argument. It contends that the Court should reject Kandukuri's declaration because ITServe filed it nearly a year after its Complaint. *See* Compl. (filed Dec. 31, 2020); Kandukuri Decl. (filed Sept. 29, 2021). DHS cites *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.4 (1992), for the proposition that standing must be determined as of the time the suit begins. *See* Def.'s Reply at 11. So the Court can consider facts in the Kandukuri Declaration that pre-date the Complaint, but not facts that post-date it. *Id.* And if the Court focuses on events pre-dating the Complaint, DHS argues Kandukuri's declaration is insufficient because it "says nothing about any employee transfers that might provide [Saxon Global] (as a member of ITServe) with any certainly impending future injury." *Id.* at 12.

The Court can draw conclusions from Kandukuri's declaration even if it rejects the two sections DHS finds most troublesome: Kandukuri's reference to fees paid "this year" (which presumably refers to 2021, not 2020), and Kandukuri's reference to the 63 H-1B petitions Saxon

Global expects to file over the next three years as a result of *Simeio*. *See* Kandukuri Decl. ¶¶ 14–16. Kandukuri states in paragraph 3 that he has served as president of Saxon Global since 2008, so Saxon Global existed in 2020 when the Complaint was filed. And Kandukuri says that the "nature of the services [Saxon Global] provides" requires constantly moving employees. *Id.* ¶ 9. The declaration does not suggest—and DHS does not argue—that Saxon Global's business model changed between 2020 and 2021. So the Court can comfortably conclude that Saxon Global was moving employees around in 2020, too, and therefore faced increased costs because of *Simeio*.[4]

The Kandukuri Declaration thus identifies a specific member company harmed by *Simeio* in just the way the Varada Declaration describes. It would have been prudent—and helpful to DHS and the Court—for ITServe to have filed the Kandukuri Declaration with its Complaint. Either declaration, standing alone, might not have been enough. But taking the Varada and Kandukuri Declarations together, ITServe overcomes DHS's standing argument.

**B.**

The Court requested supplemental briefing about whether a non-party like ITServe has standing to challenge an agency adjudication. *See* Order, ECF No. 29. In *Conference Group, LLC v. FCC*, 720 F.3d 957 (D.C. Cir. 2013), the Circuit held that "the mere fact that an adjudication creates a precedent that could harm a non-party does not create the injury-in-fact

---

[4] For this reason, the Court rejects DHS's argument that "ITServe has not shown any 'certainly impending' injury to either itself or its members." Def.'s Reply at 12 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). DHS argues that "some day" intentions "prove[] nothing" without "any description of concrete plans." *Id.* at 14 (quoting *Lujan*, 504 U.S. at 564). But ITServe's members are very different from the *Lujan* plaintiffs, who could make only vague statements about their future intentions. ITServe's members move employees every 6–12 months, so they are being affected now—not at some undefinable future time. *See* Compl. ¶ 7; Varada Decl. ¶¶ 9–11; *see generally* Kandukuri Decl.

required for Article III standing." *Id.* at 959.  Conference Group, an associational plaintiff, could therefore challenge a decision of the Federal Communications Commission if the Commission's decision was a rulemaking, but not if it was an adjudication. *See id.* at 962.  But the Circuit's opinion in *Teva Pharmaceuticals USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010), provides an exception to the rule in *Conference Group* when harm is sufficiently imminent. *See id.* at 1314 ("We have . . . allowed a party to challenge in advance an agency policy adopted via adjudication when the prospect of impending harm *was* effectively certain.").

ITServe submits two arguments about why *Conference Group* should not control here. *First*, ITServe argues that *Simeio* "does not qualify as an adjudication" but is instead "a spurious rule masquerading as an adjudication." *See* Pl.'s Resp. to Order to Show Cause (Pl.'s Resp.) at 3, ECF No. 30.  Because the Court determines below that *Simeio* was an adjudication, *see* Section V.C, the Court does not address this argument here. *Second*, ITServe argues that *Conference Group* relied on "a line of cases holding that the mere precedential effect of an agency's decision is not enough in itself to establish an injury in fact." *Id.* at 4–5.  In those cases, ITServe contends that the plaintiffs failed "to connect the challenged agency precedent with a showing of imminent harm based on an application of the challenged precedent." *Id.* at 5. ITServe argues that this case is more like *Teva* because of the imminence of injury to its members. *Id.* at 5–7.

DHS counters that *Simeio* is an adjudication and that a "bystander" lacks standing to challenge "the precedential effect of an agency action." Def.'s Resp. to Order to Show Cause (Def.'s Resp.) at 2, ECF No. 31 (quoting *Conf. Grp.*, 720 F.3d at 963).  DHS distinguishes *Teva* because there the plaintiff could show an "impending *application* of an agency's statutory interpretation, the firmness of which [was] not in dispute, on a fast-arriving date certain." *Id.* at

6 (quoting *Teva*, 595 F.3d at 1313).  No imminent application of an agency decision is involved

here, says DHS, because "no specific plans to file an amended H-1B petition with USCIS have

even been alleged by *any* of ITServe's members."  *Id.*  DHS concludes that "ITServe's members'

allegations of injury from *Simeio* rest on a hypothetical scenario."  *Id.* at 8.

   The Court agrees with ITServe that this case is more like *Teva* than *Conference Group*.

In *Teva*, the Circuit explained that "[f]or the purpose of the classic constitutional standing

analysis, it makes no difference to the 'injury' inquiry whether the agency adopted the policy at

issue in an adjudication, a rulemaking, a guidance document, or indeed by ouija board; provided

the projected sequence of events is sufficiently certain, the prospective *injury* flows from what

the agency is going to do, not how it decided to do it."  595 F.3d at 1312.  *Teva* then reviewed a

handful of cases suggesting that a bystander cannot challenge an agency adjudication.  *Id.* at

1313.  It concluded that "[i]n each instance . . . the failure to demonstrate standing is more

naturally understood as arising from the lack of a sufficiently imminent and concrete injury than

from some sort of ad hoc exception to otherwise-universally applicable constitutional doctrine."

*Id.*  The court synthesized the cases suggesting a bystander cannot challenge an adjudication as

follows: "merely foreseeable future litigation resulting from a statutory interpretation that an

agency has adopted in an adjudication is, alone—i.e., without more—too speculative to satisfy

Article III's injury-in-fact requirement.  An agency's imminent application of its established

interpretation of a statute, at the potential cost of hundreds of millions of dollars to the regulated

firm [which was the alleged harm in *Teva*], remains, by contrast . . . sufficient for standing

purposes."  *Id.* at 1314–15 (cleaned up).

   *Conference Group*—which followed several years later—did not overrule *Teva*.  Instead,

the Circuit distinguished the controversy before it and the one in *Teva* on three bases.  *First*,

Teva brought its own action in district court instead of "appealing the adjudication of another party" as Conference Group sought to do. *Conf. Grp.*, 720 F.3d at 963. *Second*, Teva could point to an imminent application of the disputed policy against it; Conference Group could not. *Id.* at 964. *Third*, if the FCC sought to apply its rule to Conference Group, Conference Group could "raise its substantive arguments in its own adjudication." *Id.* But unlike *Conference Group*, where the harm stemmed directly from agency regulatory action, in *Teva* the harm stemmed from an agency statutory interpretation that opened Teva up to third-party competition. *See Teva*, 595 F.3d at 1304. So "the imminent threat was not the [agency's] decision [as in *Conference Group*,] but third-party competition whose effects on the market a reviewing court would be unable to unscramble." *Conf. Grp.*, 720 F.3d at 963. The court noted that it was "unlikely that Teva could have obtained a stay to stop this presumably lawful third-party conduct that the [agency] declined to block." *Id.* at 964.

On two of the distinctions between *Teva* and *Conference Group*, this case is more like *Teva*. The final distinction suggests this case is more like *Conference Group*. ITServe challenges *Simeio* in district court, unlike Conference Group, which sought direct review of the FCC's decision in the Circuit. *See Conf. Grp.*, 720 F.3d at 962 (stating that Conference Group invoked jurisdiction under 47 U.S.C. § 402(a), which allows the Circuit to review orders of the FCC). And the Court has determined that ITServe can show an imminent and ongoing threat of injury to its members. ITServe does not, however, face "third-party competition whose effects on the market a reviewing court would be unable to unscramble." *Id.* at 963.

Although a close call, the Court finds this case is more like *Teva*. The *Teva* court stressed the imminence of the injury as the primary reason that Teva had standing to challenge an agency adjudication. *See Teva*, 595 F.3d at 1312. And here, ITServe's members face injury

from *Simeio*.  Admittedly, if ITServe had submitted the Kandukari Declaration with its Complaint that would made the Court's standing analysis easier.  The Kandukuri Declaration goes a long way toward establishing the imminence of injury.  The Court finds that based on the member companies' business models they face increased costs because of *Simeio*.  Thus, ITServe shows the necessary imminence of injury.

The Court holds that ITServe has standing.

## V.

The Court moves now to ITServe's arguments about the merits.

### A.

ITServe's first merits argument is that USCIS lacks the authority to regulate the employment conditions of H-1B workers.  *See* Mem. of P. & A. in Supp. of Pl.s' Mot. for Summ. J. (Pl.'s Mem.) at 31, ECF No. 16-1.  ITServe claims that a tapestry of five statutory provisions splits enforcement authority between Labor and DHS and that DHS is trying to encroach on Labor's statutory authority.  *Id.*

A description of the statutory text helps explain ITServe's argument.  The first statute outlining Labor's authority is 8 U.S.C. § 1182(n)(1).  The statute says that "(n)o alien may be admitted or provided status as an H–1B nonimmigrant in an occupational classification unless the employer has filed" for an LCA with Labor.  The next section, 8 U.S.C. § 1182(n)(2), says that Labor "shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application."

The first two statutes describing DHS's authority are 8 U.S.C. § 1101(a)(15)(H)(i)(b), which defines an H-1B nonimmigrant based on a "specialty occupation," and §§ 1184(i)(1)–(2),

which defines a "specialty occupation."  DHS, then, has the authority to determine whether an employee meets the definition of "specialty occupation."  The final statute is 8 U.S.C. § 1184(c)(1).  It says that DHS may determine "the question of importing any alien as a nonimmigrant" in H-1B status "upon petition of the importing employer" and "after consultation with appropriate agencies of the Government."[5]

Now to ITServe's arguments.  *First*, it maintains that 8 U.S.C. §§ 1182(n)(1) and (2) grant Labor "exclusive jurisdiction . . . over the regulation, and approval in particular cases, of the wages and working conditions applicable to the employment of H-1B nonimmigrants, including the location of employment."  Pl.'s Mem. at 31.  DHS, on the other hand, can determine "whether the employer's job and the foreign national's training meet the definition of a specialty occupation in terms of the statutorily defined educational requirements."  *Id.* at 32.  Because 8 U.S.C. § 1101(a)(15)(H)(i)(b) and §§ 1184(i)(1)–(2) do not give DHS the power to investigate wage rates, ITServe says the AAO overstepped its statutory authority by "inject[ing] USCIS into the exclusive domain of [Labor]."  *Id.* at 32–33.

ITServe analogizes the AAO's action to *Bayou Lawn v. Secretary of Labor*, 713 F.3d 1080 (11th Cir. 2013).  In that case, it was Labor, not DHS, whose rules were under review.  The Eleventh Circuit, reviewing the grant of a motion for preliminary injunction, found plaintiffs had showed a likelihood of success on the merits that Labor overstepped its statutory authority when it promulgated rules for the H-2B visa program.  *See Bayou Lawn*, 713 F.3d at 1085.  It noted that Congress had explicitly granted rulemaking authority to Labor over the H-2A program, and

---

[5]  Section 1184(c)(1) assigns this authority to the Attorney General, not DHS.  But the Homeland Security Act of 2002, 6 U.S.C. § 101 *et seq.*, transferred the adjudication of immigrant visas to DHS.  *See* 6 U.S.C.A. § 271 (transferring "adjudications" of immigrant visa petitions and "[a]ll other adjudications performed by the Immigration and Naturalization Service" to USCIS).

the absence of the rulemaking authority for the H-2B program was therefore likely intentional. *Id.* at 1084. ITServe contends that DHS's decision in *Simeio* similarly oversteps the agency's authority.

ITServe is mistaken. None of these statutes support ITServe's position because DHS is not conducting initial reviews of LCAs or investigating complaints about or violations of LCAs—responsibilities given to Labor. *See* 8 U.S.C. §§ 1182(n)(1)–(2). Instead, DHS requires that H-1B petitions—over which it has authority—match the information in the LCA. If the two do not match, then the petitioner must amend the petition—or file a new one—so that they do match. This case is therefore unlike *Bayou Lawn*, where Labor issued regulations in an area over which it had no authority. *See Bayou Lawn*, 713 F.3d at 1084–85.

*Second,* ITServe argues that *Simeio*'s requirement that its members file a new or amended petition with each LCA conflicts with the interaction of 8 U.S.C. § 1184(c)(1) and § 1182(n)(1). *See* Pl.'s Mem. at 35. Recall that § 1184(c)(1) gives DHS the authority to "import[] any alien" in H-1B status "after consultation with appropriate agencies of the Government." Section 1182(n)(1) says that no alien may be "admitted or provided status" under H-1B unless the employer first files for an LCA with Labor.

ITServe says that DHS's "consultation" with Labor under § 1184(c)(1) is only triggered if an alien is "admitted or provided status" under § 1182(n)(1). *See* Pl.'s Mem. at 35. If an alien has *already* been "admitted" or "provided status" as an H-1B nonimmigrant, the filing of a new petition to cover new work locations does not count as being "admitted or provided status." *Id.* And if there is no trigger for a consultation under § 1184(c)(1), then under § 1182(n)(1) DHS may not "import" an alien in H-1B status. *Id.*

ITServe confuses statutory silence with statutory disapproval.  *See* Def.'s Mem. at 38 ("[T]he statute is silent regarding whether DHS may approve a petition where the LCA that is included with an H-1B petition does not correspond with where the beneficiary will actually work."); *see also Catawba Cty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (per curiam) (when considering statutes administered by agencies, silence "may signal permission rather than proscription"); Antonin Scalia and Bryan J. Garner, *Reading Law: The Interpretation of Legal Texts* 93–100 (2012) (explaining the "omitted-case canon—the principle that what a text does not provide is unprovided").  Nowhere do the statutes bar DHS from requiring a new petition when there is a new LCA.

Instead, the statutory scheme puts Labor in a gatekeeper function as the first part of a two-step petition process.  More, as *Simeio* noted, federal regulations *require* DHS to check that the petition matches the LCA.  *See Simeio*, 26 I&N Dec. at 546 n.6 (citing 20 C.F.R. § 655.705(b) ("DHS accepts the employer's petition (DHS Form I-129) with the [Labor]-certified LCA attached.  In doing so, the DHS determines whether the petition is supported by an LCA which corresponds with the petition.")); *see also*, *United States v. Narang*, No. 19-4850, 2021 WL 3484683, at *1 (4th Cir. Aug. 9, 2021) (per curiam) ("[USCIS] adjudicators look for whether [the] employment [listed in the H-1B petition] will conform to the wage and location specifications in the LCA.").  ITServe does not challenge this regulation, and the AAO's decision adheres to its directive.

*Simeio* thus never inserts USCIS into the LCA process.  It only allows USCIS to consider the LCA when adjudicating a petition.  That is within USCIS's authority.[6]

---

[6]  Because the Court has determined that ITServe's arguments fail and that *Simeio* falls within DHS's area of authority, as explained by 20 C.F.R. § 655.705(b), it need not consider the parties' disputes over whether 8 U.S.C. § 1103(a)(1) gives DHS plenary authority over H-1B petition

**B.**

ITServe next argues that the Secretary never designated *Simeio* as a precedential

decision.  *See* Pl.'s Mem. at 36–38.  Recall that "the Secretary of DHS may, with the Attorney

General's approval, designate AAO decisions to serve as precedents in all future proceedings

involving the same issue(s)."  AAO Practice Manual § 1.5; *see also* 8 C.F.R. § 103.3(c).  But

ITServe contends that because there is no designation in the administrative record, *Simeio* is non-

precedential.  Non-precedent decisions "do not create or modify USCIS policy or practice" and

therefore they cannot "provide a basis for applying new or alternative interpretations of law or

policy."  AAO Practice Manual § 1.5.

ITServe overlooks that the Secretary delegated his authority to designate precedential

decisions to the DHS general counsel who designated *Simeio* as precedential.  This is evident

from two documents provided by DHS.  *First*, a letter from Janet Napolitano and Eric Holder,

then the Secretary of Homeland Security and Attorney General, respectively, "designat[ing] the

General Counsel as the official within the Department of Homeland Security who may file

precedential decisions with the Attorney General."  Let. from Janet Napolitano and Eric Holder

(July 29, 2009) at 2, ECF No. 22-2.  *Second*, a letter from Stevan E. Bunnell, then the general

counsel of DHS, requesting that DOJ designate *Simeio* as precedential.  *See* Let. from Stevan E.

Bunnell to Juan P. Osuna (Nov. 7, 2014), ECF No. 21-3.

ITServe argues that the Court cannot consider these documents because they were not

"before" the AAO when it made its decision.  *See* Pl.'s Reply at 23–24.  To be sure, the Court

---

adjudication.  *See* Def.'s Mem. at 37–39 (arguing § 1103(a)(1) gives DHS complete authority
over immigration law); Pl.'s Reply at 11–13 (arguing USCIS's appeal to § 1103(a)(1) is a post-
hoc rationalization).

"should have before it neither more nor less information than did the agency when it made its decision."  Pl.'s Mem. at 37 (citing *Walter O. Boswell Mem'l. Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).  But the reason for this rule is so a party cannot "withhold *evidence* unfavorable to its case."  *Walter O. Boswell Mem'l. Hospital*, 749 F.2d at 792 (emphasis added).

The letter from Secretary Napolitano and Attorney General Holder was not "evidence" in the case.  It had nothing to do with the merits but instead describes a delegation of authority to designate cases as precedential.  This delegation applies to *all* AAO cases, not just *Simeio*.  And the letter from Bunnell designating *Simeio* as precedential is similarly unrelated to *Simeio*'s merits—indeed, the letter did not even exist until after the AAO's decision.  Finally, in the APA context, the Court may "consider documents in the public record of which the court may take judicial notice."  *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 112 (D.D.C. 2020) (citing *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).  So the Court may consider these letters.

More, because *Simeio* was published in the Immigration and Naturalization Reporter, DHS is entitled to a presumption of regularity.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)).  That presumption shifts the burden onto ITServe to present credible evidence that the decision was not properly designated.  *See Latif v. Obama*, 677 F.3d 1175, 1179 (D.C. Cir. 2011).  Because ITServe has not shown there was any irregularity in the designation, the Court presumes DHS properly designated *Simeio*.

The Court finds that DHS properly designated *Simeio* as precedential.

**C.**

ITServe's next argument is that *Simeio* is not an adjudication at all but a procedurally

defective legislative rule. *See* Pl.'s Mem. at 38–50. The APA distinguishes between a

rulemaking, *see* 5 U.S.C. § 551(5), and an adjudication, *see* 5 U.S.C. § 551(7). An agency

authorized by statute to engage in rulemaking and adjudication may choose which procedure to

use when addressing a particular issue. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

But regardless of the chosen process, an agency that announces in essence a substantive

rulemaking must abide by the APA's rulemaking procedures. The agency may not label its

action an adjudication and thereby avoid those requirements. *See Nat'l Ass'n of Home Builders*

*v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("[R]ules is rules, no

matter their gloss . . . we have not hesitated to consider an agency pronouncement issued without

meeting required APA procedures a rule.") (cleaned up).

The D.C. Circuit recognizes two principles that distinguish between rules and

adjudications. "First, most legislative rules are generally applicable." *Safari Club Int'l v. Zinke*,

878 F.3d 316, 332 (D.C. Cir. 2017). "Second, rules generally have only 'future effect' while

adjudications immediately bind parties by retroactively applying law to their past actions." *Id.* at

333.

ITServe marshals three arguments for its position. *First,* it argues that the AAO's

decision applied "to the regulated public at large" and thus violated *Safari Club*'s first principle.

Pl.'s Mem. at 38. ITServe alleges that the Immigration and Naturalization Service (INS),

USCIS's predecessor agency, had proposed a rule that would have required a new H-1B petition

each time a petitioner obtained a new LCA. *Id.* at 42–43. "By reviving and imposing the INS's

proposed rule, which conflicted with a later USCIS policy statement, USCIS improperly created a rule of general applicability through an ostensible adjudication." *Id.* at 43.

ITServe analogizes this case to *Ford Motor Co. v. FTC*, 673 F.2d 1008 (9th Cir. 1981). Pl.'s Mem. at 43. There, the Federal Trade Commission began a rulemaking to eliminate a certain industry practice before beginning an adjudication against Ford for engaging in a similar practice. *See Ford Motor Co.*, 673 F.2d at 1008–1010. The FTC affirmed an administrative law judge's decision finding that Ford had violated the FTC Act by engaging in the similar industry practice. *Id.* at 1009. Relying mainly on the fact that the adjudication announced a rule with "general application," the Ninth Circuit concluded that the FTC had exceeded its authority by proceeding by adjudication rather than by rulemaking. *Id.* at 1010. The *Ford Motor* court doubted that the FTC could proceed by rulemaking about one industry practice only to turn around and announce a rule of general applicability using an adjudication in a very similar practice. *Id. Ford Motor* is like this case, ITServe contends, because in both cases an agency signaled that it thought a rule was appropriate before changing its mind and proceeding by adjudication. Pl.'s Mem. at 43–44.

But although *Safari Club* states that "most legislative rules are generally applicable," that is a statement about *rules*, not *adjudications*. *Safari Club Int'l*, 878 F.3d at 332. *Safari Club* does not say that adjudications cannot also have generally applicable effect. Nor could it have—firmly established law makes clear that an adjudication can have binding effect beyond the parties involved. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (holding that an agency is "not precluded from announcing new principles in an adjudicative proceeding"); *Conf. Grp.*, 720 F.3d at 965 ("The fact that an order rendered in an adjudication may affect agency

policy and have general prospective application does not make it a rulemaking subject to the APA's section 553 notice and comment.") (cleaned up).

True, *Ford Motor* casts doubt on whether an agency that considers proceeding by rulemaking can then change its mind and proceed by adjudication.  But *Ford Motor* is not binding here.  More, the D.C. Circuit has cited that case only once—in a concurrence where the author said this circuit's law is "emphatically to the contrary."  *Gen. Am. Transp. Corp. v. ICC*, 883 F.2d 1029, 1031 (D.C. Cir. 1989) (Silberman, J., concurring).

*Second*, ITServe argues *Simeio* had "no retroactive effect."  Pl.'s Mem. at 44.  ITServe claims that Simeio withdrew its H-1B petition long before the AAO issued its decision.  *See id*.  In other words, USCIS used a moot case to announce a new rule.  ITServe cites a 2016 letter from USCIS in the administrative record.  *Id.*; *see also* JA at 63.  The letter, addressed to Simeio, says that "USCIS received your request to withdraw the petition."  JA at 63.  It then states that "[a] letter of withdrawal or revocation was ordered on September 23, 2011" and that the petition is "automatically revoked" under 8 C.F.R. § 214.2(h)(11)(ii).  *Id.*

Under 8 C.F.R. § 214.2(h)(12)(ii), "[a]utomatic revocations may not be appealed" to the AAO.  ITServe acknowledges that 8 C.F.R. §§ 103.4(a)(4)–(5) allow the Director "to certify an issue to the AAO in the absence of jurisdiction," but maintains that without an active petition, there could be no retroactive effect.  Pl.'s Mem. at 44.  ITServe says the lack of a retroactive effect creates two issues:  it led the AAO to address a moot issue, and it violates the second distinction between adjudications and rulemakings identified in *Safari Club*.  *Id.* at 44–46.

Start with mootness.  According to ITServe, "when an issue no longer has any bearing on the petitioner or foreign national at issue pending on appeal, the AAO normally dismisses the case as moot."  *Id.* at 45 (citing Exhibit G, ECF No. 16-9, which collects AAO decisions

dismissing cases as moot).  But even if that is what the AAO *ordinarily* does, it is not what the AAO *must* do.  Agencies are not Article III courts limited to deciding live cases or controversies.  *See Tenn. Gas Pipeline Co. v. Fed. Power Comm'n*, 606 F.2d 1373, 1380 (D.C. Cir. 1979) ("[A]gencies are generally free to act in advisory or legislative capacities . . . .  [A]n agency may, if authorized by statute, issue an advisory opinion or abstract declaration without regard to the existence of an actual controversy."); *see also Climax Molybdenum Co. v. Lab., Mine Safety & Health Admin.*, 703 F.2d 447, 451 (10th Cir. 1983) ("[A]n administrative agency is not bound by the constitutional requirement of a 'case or controversy' that limits the authority of article III courts to rule on moot issues.  Instead, an agency possesses substantial discretion in determining whether the resolution of an issue before it is precluded by mootness.") (cleaned up).  So, even assuming that Simeio withdrew its petition, no case or controversy requirement barred the AAO's decision.

Now consider *Safari Club*'s requirement that adjudications must have retroactive effect or else they are rulemakings.  This presents a trickier question.  ITServe is correct that the administrative record is sparse.  ITServe is also correct that the 2016 letter suggests that *at some point* ITServe withdrew its petition.  But the letter also leaves many unanswered questions.  It does not say when USCIS received the withdrawal request.  It does not say whether the letter of withdrawal USCIS ordered in September 2011 responded to Simeio's withdrawal request.  And it does not explain why USCIS is sending the letter to Simeio years after both the petition was purportedly revoked and the AAO had made its decision.  Indeed, the whole purpose and cause of the letter is unclear.

ITServe could have done more to discredit the letter.  It could have, for example, sought a declaration from Simeio that it withdrew its petition before the AAO's decision.  Or it could

have sought to supplement the record with additional supporting documents.  But ITServe did not do more.  Despite suggesting USCIS committed some type of fraud by certifying to itself a petition that had been withdrawn, it bases its entire argument on a cryptic letter containing only four sentences.

That is not enough.  Agency decisions are entitled to a presumption of regularity.  *See Morris v. Sullivan*, 897 F.2d 553, 560 (D.C. Cir. 1990).  Nowhere in *Simeio* did the AAO state— or even suggest—that the petitioner had withdrawn the petition before the AAO issued its decision.  The lack of any filing by Simeio's attorney before the AAO is not dispositive, because the attorney may have simply decided no filing was needed or worthwhile.  *See* 8 C.F.R. 103.3(a)(2)(vi) (providing that the party appealing to the AAO "may" file a brief).  And if Simeio did not withdraw its petition, the AAO's decision would have had retroactive effect if the AAO had decided to overturn the Director's decision.

*Third*, ITServe argues that the AAO's decision is defective because it "contains only legislative, not adjudicative, facts."  Pl.'s Mem. at 46 (citing *Ass'n of Nat. Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1161 (D.C. Cir. 1979) ("The factual predicate of adjudication depends on ascertainment of facts concerning the immediate parties who did what, where, when, how, and with what motive or intent.  By contrast, the nature of legislative fact is ordinarily general, without reference to specific parties." (cleaned up))).  ITServe says that the AAO's opinion is "divorced from the actual facts pertaining to the employer in [the] case" and "takes the form of a policy-type discussion."  *Id.* at 47.  "Without any adjudicative facts having particularized relevance to the material change rule . . . *Simeio* resulted in a legislative policy improperly promulgated through an adjudicative order."  *Id.* at 48.

But the first three pages of the decision introduce the factual and procedural history in *Simeio*.  *See Simeio*, 26 I&N Dec. at 542–44.  The "Analysis" section of the opinion applies the law directly to these facts.  *See id.* at 547–49.  True, the opinion also spends time explaining the law and justifying the AAO's interpretation of "material change" under the law.  *See id.* at 545–47.  But that is to be expected in any legal opinion.  And it hardly converts a case grounded in specific facts into a "policy-type discussion."

The Court holds that *Simeio* was an adjudication.

## D.

ITServe's final argument is that USCIS cannot issue binding interpretive rules.[7]  It grounds this argument in two contentions.  For starters, ITServe says that DHS draws its adjudicatory authority from 6 U.S.C. § 112(c) and 8 U.S.C. §§ 1184(a)(1) and (c)(1).  *See* Pl.'s Mem. at 54.  ITServe maintains that none of these statutes grant DHS authority to use "formal trial-type adjudications to decide H-1B petitions."  *Id.* at 52.  Next, ITServe says that "formal trial-type adjudications" can create "precedents imposed on parties in future cases," but "informal adjudications do not establish legally binding rules because they are only binding on the parties in the case."  *Id.* at 52–53.  Because DHS cannot conduct formal adjudications, it can only proceed by informal adjudication.  That would mean that all the AAO's rulings, including *Simeio*, lack binding effect on nonparties.

The Court disagrees.  Federal regulations make precedential decisions like *Simeio* binding.  Nowhere in either its memorandum in support of its motion for summary judgment or

---

[7] ITServe also argues that *Simeio* did not announce a permissible interpretive rule.  *See* Pl.'s Mem. at 50–51.  DHS calls this argument a "red herring because DHS agrees that *Simeio* should not be considered an interpretive rule.  It is not a 'rule' at all . . . [I]t is an adjudication."  Def.'s Mem. at 48.  Because DHS agrees that *Simeio* is not a permissible interpretive rule—and because the Court agrees with DHS that *Simeio* is an adjudication—it need not address this argument.

its opposition and reply does ITServe discuss DHS's authority to designate AAO decisions as precedential under 8 C.F.R. § 103.3(c). *See* Pl.'s Mem. at 51–55 (arguing DHS cannot issue binding interpretive rules but omitting discussion of § 103.3(c)); Pl.'s Reply at 20–23 (same). This regulation specifies that the Secretary or her delegate "may file with the Attorney General decisions relating to the administration of the immigration laws of the United States for publication as precedent in future proceedings." 8 C.F.R. § 103.3(c). Recall that the Secretary delegated her authority to designate decisions as precedential to the DHS general counsel, *see* Let. from Janet Napolitano and Eric Holder (July 29, 2009), and that the general counsel designated *Simeio* as precedential, *see* Let. from Stevan E. Bunnell to Juan P. Osuna (Nov. 7, 2014). *Simeio*'s appearance in the Immigration and Naturalization Reporter shows that the decision was in fact published.

The regulation also states that designated decisions "are to serve as precedents in all proceedings involving the same issue(s) . . . [T]hey are binding on all [USCIS] employees in the administration of the Act." 8 C.F.R. § 103.3(c). Recognizing the binding nature of designated decisions, courts often rely on them when interpreting immigration law. *See, e.g.*, *Nohria v. Renaud*, No. 20-CV-2085, 2021 WL 950511, at *2 (D.D.C. Mar. 14, 2021) (citing *Matter of Chawathe*, 25 I. & N. Dec. 369, 375–76 (2010) for petitioners' burden of proof); *Nat'l Cap. Presbytery v. Mayorkas*, No. CV 18-2681 (TJK), 2021 WL 4860621, at *1 (D.D.C. Oct. 19, 2021) (same).

Rather than explain why a decision designated under 8 C.F.R. § 103.3(c) is not binding, ITServe insists that informal adjudications can only be binding on the parties in the case. *See* Pl.'s Mem. at 53. But the precedential effect of an AAO decision, even an informal one, can impact third parties without transforming an adjudication into a rulemaking. *See Neustar*, 857

F.3d at 895 ("Neither does some tangential impact on other entities necessarily transform an informal adjudication into a rulemaking since the nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal.") (cleaned up); *Conf. Grp.*, 720 F.3d at 966 ("The fact that an order rendered in an adjudication may affect agency policy and have general prospective application does not make it rulemaking subject to APA section 553 notice and comment.") (cleaned up). More, the Circuit has explicitly recognized DHS's authority to designate AAO decisions as precedential. *See Fogo De Chao*, 769 F.3d at 1137 (noting that under 8 C.F.R. 103.3(c), DHS "may, with the concurrence of the Attorney General, designate an Appeals Office decision as precedential").

At bottom, ITServe misunderstands *Simeio*'s effects. ITServe argues that "USCIS treats the requirements stated in *Simeio* as a legislative rule compelling compliance [by third parties] without exception." Pl.'s Reply at 21. That is wrong. *Simeio* does not directly regulate third parties. Rather, it directly regulates the activities of USCIS employees adjudicating H-1B petitions. This distinction, while technical, is crucial. That third parties will be affected by these new USCIS policies does not invalidate *Simeio*, as *Neustar* and *Conference Group* make clear.

ITServe counters that these cases do not directly address its claim that an agency proceeding by informal adjudication cannot create binding precedents. *Id.* at 22. But ITServe's position cannot square with 8 C.F.R. § 103.3(c). If ITServe were correct that, because DHS cannot conduct formal adjudication, its adjudicatory proceedings can have no precedential effect, then what work would 8 C.F.R. § 103.3(c) do? Nothing at all. And yet, many courts in this Circuit and have elsewhere recognized DHS's authority to designate cases as precedential under that regulation. This is fatal to ITServe's argument.

In sum, the Circuit has flatly rejected ITServe's contention that "an agency may only use formal trial-type adjudications to issue binding interpretive rules as precedents imposed on parties in future cases." The Court follows Circuit precedent and rejects ITServe's argument.[8]

## VI.

ITServe's arguments that *Simeio* executes an end-run around the APA are nonfrivolous. *Simeio* expanded USCIS's already broad regulatory authority without the hassle of notice-and-comment rulemaking. Perhaps it would be better for USCIS to announce such an important change through a regulation.

But as the APA binds agencies, so precedent binds this Court. And here precedent favors USCIS. The Court thus will deny ITServe's motion for summary judgment and will grant DHS's cross-motion for summary judgment except as to standing. A separate Order will issue.

Dated: February 17, 2022

_____
TREVOR N. McFADDEN, U.S.D.J.

---

[8] ITServe also argues that "Congress has authorized the Secretary to engage in formal adjudications for resolving issues in the H-2B program, but not in the H-1B program." Pl.'s Mem. at 54. That would be relevant if this case involved formal adjudication. It does not. ITServe appears to be arguing that because the relevant statute limits DHS's authority to use formal rulemaking in the H-1B context, it cannot create binding *rules* in H-1B adjudications. But as already discussed, informal adjudication can create binding *precedents* for USCIS, which will affect later, similarly situated parties.